**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION**

| | |
|---|---|
| **JENNIFER AGUILAR, MICHELLE MUNOZ, & NICOLE ROGERS,** on behalf of themselves and all others similarly situated, | |
| | **No. 1:22-cv-688** |
| **Plaintiff,** | |
| **v.** | **Jury Trial Demanded** |
| **HEALTH CARE SERVICE CORPORATION,** | |
| **Defendant.** | |

<u>ORIGINAL</u>
<u>CLASS AND COLLECTIVE ACTION COMPLAINT</u>

Plaintiffs Jennifer Aguilar, Michelle Munoz and Nicole Rogers (collectively, "Plaintiffs") file this Original Class and Collective Action Complaint ("Complaint") against Defendant Health Care Service Corporation ("Defendant") and in support states the following:

**Nature of this Lawsuit**

1.     To receive federal funding, state agencies that choose to contract with Managed Care Organizations ("MCOS") to provide managed care services to Medicaid enrollees must "ensure, through [their] contracts, that each MCO…" provide the specific services for enrollees with special health care needs or who need Long Term Services and Supports ("LTSS") described in 42 C.F.R. § 438.208(c).

2.     In New Mexico, the New Mexico Human Services Department ("HSD") is the state agency that has been responsible for the administration of New Mexico's Medicaid Managed Care Program ("NM Medicaid Program").

3.      Since 2013, HSD has contracted with Managed Care Organizations ("MCOs") to provide managed care services to Medicaid Enrollees as part of its Centennial Care Medicaid Managed Care Program ("Centennial Care Program").

4.      HSD's quality strategy identifies the mechanisms its uses "to identify person who need LTSS … to MCOs, as those persons are defined by the State" in all of its quality strategy documents produced since 2013.

5.      In HSD's September 2017 Update to its Quality Strategy, HSD defines the "care coordination" requirements that it imposes on its contracting MCOs:

> HSD/MAD requires the MCOs to conduct a standardized health risk assessment (HRA) on each member to determine if he or she requires a comprehensive needs assessment (CNA) and/or a higher level of care coordination. The CNA identifies members requiring level 2 or level 3 care coordination and is followed by the development of a Comprehensive Care Plan (CCP), which establishes the necessary services based on needs identified in the CNA. Members assigned to care coordination level 2 or level 3 are assigned to a care coordinator who is responsible for coordinating their total care.

6.      In HSD's January 2019 revision to its Quality Strategy, HSD defines its "care coordination" requirements that it imposes on its contracting MCOs as the following:

> HSD/MAD requires the MCOs, or their delegate, to conduct a standardized Health Risk Assessment (HRA) on members who are newly enrolled in Centennial Care or who are not in Care Coordination Level (CCL) 2 or 3 and have a change in health condition that requires a higher level of care coordination. The HRA will indicate if a member requires a Comprehensive Needs Assessment (CNA) to determine if the member should be assigned CCL 2 or 3. For members who have indicators that may warrant a NF LOC, the MCO will conduct a CNA and use the New Mexico Nursing Facility Level of Care Criteria and Instructions to determine NF LOC eligibility for members in need of Home and Community Based Services (HCBS) or Nursing Facility care. The results of the CNA and NF LOC assessment will be used to create the Comprehensive Care Plan (CCP) inclusive of the authorized HCBS services.

7.      In HSD's March 2021 revision to its Quality Strategy, HSD defines its "care coordination" requirements that it imposes on its contracting MCOs as the following:

> HSD requires the MCOs, or their delegate, to conduct a standardized Health Risk Assessment (HRA) on members who are newly enrolled in Centennial Care or who are not in Care Coordination Level (CCL) 2 or 3 and have a change in health condition that requires a higher level of care coordination. The HRA will

indicate if a member requires a Comprehensive Needs Assessment (CNA) to determine if the member should be assigned CCL 2 or 3. For members who have indicators that may warrant a NF LOC, the MCO will conduct a CNA and use the New Mexico Nursing Facility Level of Care Criteria and Instructions to determine NF LOC eligibility for members in need of Home and Community Based Services (HCBS) or Nursing Facility care. The results of the CNA and NF LOC assessment will be used to create the Comprehensive Care Plan (CCP) inclusive of the authorized HCBS services.

8.      HCSC Insurance Company Services, Inc. d/b/a Blue Cross and Blue Shield of New Mexico ("MCO Subsidiary") is a directly controlled subsidiary of Defendant.

9.      The MCO Subsidiary has no employees.

10.     From February 1, 2013 to December 31, 2018, the MCO Subsidiary contracted with HSD to provide care coordination services to New Mexico Medicaid Enrollees, as described in HSD's quality strategy for the Centennial Care Medicaid Managed Care Program.

11.     From February 2013 to December 31, 2018, the MCO Subsidiary contracted with HSD to provide care coordination services that were required to be performed in adherence with Section 4.4 (entitled "care coordination") of the Medicaid Managed Care Services Agreement between HSD and the MCO Subsidiary pertaining to New Mexico's Medicaid Centennial Care Program.

12.     From February 2013 to December 31, 2018, the MCO Subsidiary subcontracted with Defendant to provide care coordination services to New Mexico Medicaid Enrollees, as described in HSD's quality strategy for the Centennial Care Medicaid Managed Care Program.

13.     From February 2013  to December 31, 2018, the MCO Subsidiary subcontracted to provide care coordination services in adherence with Section 4.4 (entitled "care coordination") of the Medicaid Managed Care Services Agreement between HSD and the MCO Subsidiary pertaining to the Centennial Care Medicaid Managed Care Program.

14.     From January 2018 to the present, the MCO Subsidiary has contracted with HSD to provide care coordination services to New Mexico Medicaid Enrollees, as those services are described in HSD's quality strategy for the Centennial Care 2.0 Medicaid Managed Care Program.

15.     From January 2018 to the present, the MCO Subsidiary has contracted with HSD to provide care coordination services that were required to be performed in adherence with Section 4.4 (entitled "care coordination") of the Medicaid Managed Care Services Agreement between HSD and the MCO Subsidiary pertaining to New Mexico's Medicaid Centennial Care 2.0 Program.

16.     From January 2018 to the present, the MCO Subsidiary has subcontracted with Defendant to provide care coordination services to New Mexico Medicaid Enrollees, as described in HSD's quality strategy for the Centennial Care 2.0 Medicaid Managed Care Program.

17.     From January 2018 to the present, the MCO Subsidiary has subcontracted to provide care coordination services in adherence with Section 4.4 (entitled "care coordination") of the Medicaid Managed Care Services Agreement between HSD and the MCO Subsidiary pertaining to the Centennial Care 2.0 Medicaid Managed Care Program.

18.     All versions of the Medicaid Managed Care Services Agreements between HSD and the MCO Subsidiary pertaining to the care coordination services, which Defendant subcontracted to provide on behalf of the MCO Subsidiary, are available at the following web address: www.hsd.state.nm.us/lookingforinformation/medical-assistance-division/

19.     From at least October 2013 to the present, Defendant as the MCO Subsidiary's subcontractor under the Medicaid Managed Care Services Agreement, was required to provide care coordination that complied with 42 C.F.R. 438.208 and all of the requirements of the Medicaid Managed Care Services Agreement in effect at the relevant time.

20.     From at least October 2013 to the present, Defendant as the MCO Subsidiary's subcontractor under the Medicaid Managed Care Services Agreement, was required to provide care coordination that complied with HSD's Managed Care Policy Manual in effect at the relevant time.

21.     From at least October 2013 to the present, Defendant as the MCO Subsidiary's subcontractor under the Medicaid Managed Care Services Agreement in effect, was required to design

4

and implement care coordination that included the following steps: (1) conducting a standardized Health Risk Assessment ("HRAs") on each member to determine if the member requires a comprehensive needs assessment ("CNA") (2) assigning a "**care coordinator**" to individuals who have been identified as needing a CNA; (3) having a "**care coordinator**" perform a CNA on the assigned members, the results of which determines whether the member is assigned to Care Coordination Level 2 or 3; (4) producing a care plan that reflects the needs identified in the Member's CNA ("Care Plans") and (5) quarterly/monthly monitoring "touchpoints" for Members, depending on whether the member was assigned to Care Coordination Level 2 or 3 ("Touchpoints").

22.     From at least October 2013 to the present, Defendant. as the MCO Subsidiary's subcontractor under the Medicaid Managed Care Services Agreement in effect, was required to meet the "Care Coordination Staffing Requirements" set in Section 4.4.12 of the relevant Medicaid Managed Care Services Agreement.

23.     From at least October 2013 to the present, Defendant, as the MCO Subsidiary's subcontractor under the Medicaid Managed Care Services Agreement, was required to employ as sufficient number of "Care Coordinators" to meet the specific staffing requirements set by Section 4.4.12.5 of the Medicaid Managed Care Services Agreement in effect.

24.     From at least October 2013 to the present, Defendant. as the MCO Subsidiary's subcontractor under the Medicaid Managed Care Services Agreement in effect, was required to submit for review and approval, an annual Care Coordination Staffing Plan, in which it was required to specify the following: (1) the number of "care coordinators" it planned to employ; (2) the ratio of "care coordinators" to members; (3) the method by which Defendant planned to maintain ratios in accordance with the ratios in Section 4.4.12.5 of the Medicaid Managed Care Services Agreement in effect; and (4) how Defendant planned to ensure that such ratios were sufficient to fulfill the requirements of the relevant Medicaid Managed Care Services Agreement.

25.     Defendant has employed individuals as "Care Coordinators," as that term is understood under the Medicaid Managed Care Services Agreement in effect, from at least October 2013 to the present ("BCBS Care Coordinators").

26.     Defendant assigns different job titles to BCBS Care Coordinators based on whether or not the individual possesses a clinical license.

27.     Defendant assigns the job title of "Member Care Coordinator" to its BCBS Care Coordinators who do not possess clinical licensure, such as licensure as a registered nurse or licensure as a licensed social worker ("Member Care Coordinators").

28.     Defendant assigns the job title of "Medical Management Specialist" to its BCBS Care Coordinators who possess clinical licensure, such as licensure as a registered nurse or licensure as a clinical social work ("Medical Management Specialists").

29.     Defendant assigns BCBS Care Coordinators to work on the same regional teams as one another, regardless of job title assigned to the BCBS Care Coordinator.

30.     From 2013 to the present, Defendant counted both Member Care Coordinators and Medical Management Specialists for purposes of identifying (1) the number of care coordinators it planned to employ; and (2) the care-coordinator-to-staffing ratios, it was required to report in its Care Coordination Staffing Plans submitted to HSD pursuant to Section 4.4.12.5 of the Medicaid Managed Care Services Agreement in effect.

31.     Regardless of licensure or internal job title assigned, all BCBS Care Coordinators have performed the same job duties throughout the relevant time period, as those job duties are defined under 42 C.F.R. 432.208(c), the Medicaid Managed Care Services Agreement, HSD's Managed Care Policy Manual in effect,  the HSD quality strategy in effect, and N.M.A.C. 8.308.10.

32.     Specifically, the BCBS Care Coordinators primarily performed the following non-exempt work: (1) collecting and documenting information to produce CNAs within required

6

timeframes by using a HSD-pre-approved CNA questionnaire in compliance with Section 4.4.3 of the Medicaid Managed Care Services Agreement in effect; (2) producing "Care Plans" for Members by using the responses to the Member's CNA to document the Member's "Care Plan," by utilizing software pre-approved for use by HSD in compliance with Section 4.4.5 of the Medicaid Managed Care Services Agreement in effect; (3) completing Touchpoints for Members in accordance with Section 4.4.6-4.4.7 of the Medicaid Managed Care Services Agreements in effect; and (4) meeting the required timeframes to produce CNAs, Care Plans, and Touchpoints under the Medicaid Managed Care Services Agreement in effect.

33.    Defendant employed all BCBS Care Coordinators, including Member Care Coordinators and Medical Management Specialists, to  primarily perform non-exempt job duties, consisting of producing contractually required CNAs, Care Plans, and Touchpoints within contractually required timeframes ("Care Coordination Work").

34.    Defendant paid Medical Management Specialists a salary.

35.    Defendant's Medical Management Specialists  regularly worked over 40 hours per week.

36.    Defendant classified all Medical Management specialists as exempt from state and federal overtime laws and did not pay them overtime wages for all hours worked over 40 per workweek.

37.    Defendant employed Medical Management Specialists to primarily perform non-exempt work, consisting of Care Coordination Work.

38.    Plaintiffs bring this action on behalf of themselves and other similarly situated Medical Management Specialists, who, due to Defendant's misclassification scheme, were not paid all earned overtime pay for time they worked in excess of forty (40) hours in one or more individual work weeks in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

39.     Plaintiffs also bring class action claims under New Mexico state law under the New Mexico Minimum Wage Act ("NMMWA"), N.M. Stat. Ann. § 50-4-19, *et seq*.

40.     Plaintiffs bring their NMMWA claims pursuant to Fed. R. Civ. P. 23(b)(3) and 23(c)(4) for Defendant's failure to pay them and other Medical Management Specialists for all earned overtime pay.

41.     Defendant began classifying Medical Management Specialists as exempt from the NMMWA's overtime protections prior to September 18, 2019.

42.     Defendant continues to classify some or all Medical Management Specialists as exempt from the NMMWA's overtime protections as of the date of this filing.

43.     Defendant's violations of the NMMWA occurred as part of a continuing course of conduct under N.M. Stat. Ann. § 50-4-32.

44.     Because Defendant's violations of the NMMWA occurred as part of a continuing course of conduct, this action encompasses all overtime violations against Plaintiffs and similarly situated Medical Management Specialists, regardless of the date on which they occurred pursuant to N.M. Stat. Ann. § 50–4–32.

**The Parties**

45.     Plaintiff Aguilar worked for Defendant as a Medical Management Specialist during two time periods from approximately (1) September 2014 to August 2016; and (2) February 2017 to June 2021.

46.     Plaintiff Munoz worked for Defendant as a Medical Management Specialist from approximately October 2018 to September 2020.

47.     Plaintiff Rogers worked for Defendant as a Medical Management Specialist from approximately October 2017 to October 2021.

48.     Defendant is an Illinois Corporation.

49.     Defendant's principal place of business is in Chicago, Illinois.

50.     Defendant is the parent company of HCSC Insurance Services Company, Inc.

51.     Defendant directly controls HCSC Insurance Services Company, Inc. through its Board of Directors.

52.     Defendant does business as Blue Cross and Blue Shield of New Mexico in this state.

53.     HCSC Insurance Services Company, Inc. does business as Blue Cross and Blue Shield of New Mexico in this state.[1]

**Jurisdiction and Venue**

54.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's FLSA claims arise under federal law. *See* 29 U.S.C. § 216(b).

55.     This Court has supplemental jurisdiction over Plaintiff's NMMWA claims under 28 U.S.C § 1367(a) because they arise out of the same facts as Plaintiff's FLSA claims.

56.     Venue is proper in this District under 28 U.S.C. § 1391 because the events forming the basis of the suit occurred in this District.

**Factual Allegations**

*Care Coordination Work is Required Under Federal Law*

57.     To receive federal funding, state agencies that choose to contract with Managed Care Organizations ("MCOS") to provide managed care services to Medicaid enrollees must "ensure, through [their] contracts, that each MCO…" provide the specific services for enrollees with special health care needs or who need Long Term Services and Supports ("LTSS") described in 42 C.F.R. § 438.208(c).

---

[1] https://www.bcbsnm.com/ ("Blue Cross and Blue Shield of New Mexico, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company, an Independent Licensee of the Blue Cross and Blue Shield Association.") (last visited March 22, 2022).

58.     State agencies that contract with MCOs must "implement mechanisms to identify persons who need LTSS or persons with special health care needs to MCOs, as those persons are defined by the State." *Id.*, § (c)(1). These identification mechanisms "must be identified in the State's quality strategy under § 438.430." *Id.*, § (c)(1)(i).

59.     Each MCO that contracts with a state agency must "comprehensively assess each Medicaid enrollee identified by the state (through the mechanism described in [the State's quality strategy]) and identified to the MCO… by the State as needing LTSS or having special health care needs to identify any ongoing special conditions of the enrollee that require a course of treatment or regular care monitoring." *Id.*, § (c)(2).

60.     Each MCO that contracts with a state agency must also "produce a treatment or service plan" that meets specific criteria "for enrollees who require LTSS and, if the State requires, must produce a treatment or service plan… for enrollees with special health care needs that are determined through assessment to need a course of treatment or regular care monitoring." *Id.*, § (c)(3).

61.     The Centers for Medicaid and Medicare Services ("CMS") requires state agencies, submit and obtain prior approval for all contracts with MCOs exceeding $1 million, as a condition to receiving federal Medicaid funding. 42 C.F.R. 438.3.[2]

---

[2] CMS also requires state Medicaid agencies (HSD) that contract with MCOs to develop and maintain a Medicaid Quality Strategy to assess and improve the quality of healthcare and services provided by Managed Care Plans (MCPs). 42 CFR 438.340(a), The State's quality strategy must, among other things, identify "the mechanisms implemented by the State to comply with 42 C.F.R. § 438.208(c)(1) (relating to the identification of persons who need long-term services and supports or persons with special health care needs)." 438.340(b)(8). The State is required to "submit a copy of the initial strategy for CMS comment and feedback prior to adopting it in final." § 438.208(c)(3). "The state must make the final quality strategy available on [HSD's website] under § 438.10(c)(3)" § 438.208(d). Additionally, the state is required to review and update the quality strategy at least once every three years: The review must include an evaluation of the effectiveness of the quality strategy conducted within the previous three years. 42 C.F.R. § 438.208(2). The State is required to make the result of the review available on HSD's website. 42 C.F.R. § 438.208(c)(2)(ii)).

62.     CMS recently developed measures to "provide information about assessment and care planning processes among MLTSS plan members that can be used by states… [and managed care plans… for quality improvement purposes."[3]

63.     Specifically, in its May 2019 "Technical Specifications and Resource Manual" regarding "Measures Medicaid Managed Long Term Services and Supports Plans published by the Center for Medicare and Medicaid Services" ("CMS Medicaid Manual"), CMS explained the following: The "person responsible for conducting an assessment and care plan with a member… is not required to have a specific professional license."

### *Care Coordination Work is Further Defined in New Mexico's Quality Strategy*

64.     In New Mexico, the New Mexico Human Services Department ("HSD") is the state agency that has been responsible for the administration of New Mexico's Medicaid Managed Care Program ("NM Medicaid Program").

65.     Since 2013, HSD has contracted with Managed Care Organizations ("MCOs") to provide managed care services to Medicaid Enrollees as part of its Centennial Care Medicaid Managed Care Program ("Centennial Care Program").

66.     HSD's quality strategy identifies the mechanisms its uses "to identify person who need LTSS … to MCOs, as those persons are defined by the State" in all of its quality strategy documents produced since 2013.

67.     For example, in HSD's September 2017 Update to its Quality Strategy, HSD defines the "care coordination" requirements that it imposes on its contracting MCOs:

> HSD/MAD requires the MCOs to conduct a standardized health risk assessment (HRA) on each member to determine if he or she requires a comprehensive needs assessment (CNA) and/or a higher level of care coordination. The CNA identifies members requiring level 2 or level 3 care coordination and is followed by the development of a Comprehensive Care Plan

---

[3] https://www.medicaid.gov/medicaid/managed-care/managed-long-term-services-and-supports/index.html (last visited March 22, 2022).

(CCP), which establishes the necessary services based on needs identified in the CNA. Members assigned to care coordination level 2 or level 3 are assigned to a care coordinator who is responsible for coordinating their total care.

68.     In HSD's January 2019 revision to its Quality Strategy, HSD defines its "care coordination" requirements that it imposes on its contracting MCOs as the following:

> HSD/MAD requires the MCOs, or their delegate, to conduct a standardized Health Risk Assessment (HRA) on members who are newly enrolled in Centennial Care or who are not in Care Coordination Level (CCL) 2 or 3 and have a change in health condition that requires a higher level of care coordination. The HRA will indicate if a member requires a Comprehensive Needs Assessment (CNA) to determine if the member should be assigned CCL 2 or 3. For members who have indicators that may warrant a NF LOC, the MCO will conduct a CNA and use the New Mexico Nursing Facility Level of Care Criteria and Instructions to determine NF LOC eligibility for members in need of Home and Community Based Services (HCBS) or Nursing Facility care. The results of the CNA and NF LOC assessment will be used to create the Comprehensive Care Plan (CCP) inclusive of the authorized HCBS services.

69.     In HSD's March 2021 revision to its Quality Strategy, HSD defines its "care coordination" standard that it requires MCOs to adhere to as the following;

> HSD requires the MCOs, or their delegate, to conduct a standardized Health Risk Assessment (HRA) on members who are newly enrolled in Centennial Care or who are not in Care Coordination Level (CCL) 2 or 3 and have a change in health condition that requires a higher level of care coordination. The HRA will indicate if a member requires a Comprehensive Needs Assessment (CNA) to determine if the member should be assigned CCL 2 or 3. For members who have indicators that may warrant a NF LOC, the MCO will conduct a CNA and use the New Mexico Nursing Facility Level of Care Criteria and Instructions to determine NF LOC eligibility for members in need of Home and Community Based Services (HCBS) or Nursing Facility care. The results of the CNA and NF LOC assessment will be used to create the Comprehensive Care Plan (CCP) inclusive of the authorized HCBS services.

### *The HSD Contract Further Defines Care Coordination Work & the Qualifications of the Care Coordinators that Defendant Must Employ to Perform It*

70.     Defendant, either directly or through its MCO Subsidiary, has contracted with HSD to provide care coordination services to Medicaid Members since February 1, 2013.[4]

---

[4] www.hsd.state.nm.us/wp-content/uploads/Presbyterian-Contract.pdf (Medicaid Managed Care Services Agreement between DEFENDANT and New Mexico HSD) (last visited January 18, 2022).

71.     From February 1, 2013 to December 31, 2017, Defendant, either directly or through its MCO Subsidiary, was one of four managed care organizations ("MCO") to contract with HSD to provide care coordination and other managed care services to individuals enrolled in HSD's Centennial Care Medicaid Managed Care Program.[5]

72.     Between February 1, 2013 and December 31, 2017, Defendant, either directly or through its subsidiary, entered a Medicaid Managed Care Services Agreement and eight amendments to that contract (collectively, "1.0 Contract"), which lay out the requirements for the care coordination services that Defendant's employees provided to Medicaid Members in the Centennial Care Medicaid Managed Care Program during that time period.[6]

73.     Section 4.4.12 of the 1.0 Contract provides "care coordination" staffing requirements, including the minimum qualifications that individuals must meet to work as "care coordinators" responsible for "completing comprehensive needs assessments" of Medicaid Members.

74.      Until Defendant entered into the third amended version of the 1.0 Contract in December 2014, HSD set the following minimum requirements for the care coordinator position in section 4.4.12.3 of the 1.0 Contract:

> …. At a minimum, the care coordinator completing the comprehensive needs assessment shall have a bachelor's degree in social work, nursing or other health care profession and/or two (2) year's relevant experience. A care coordinator's direct supervisor shall be a licensed social worker or registered nurse with a minimum of two (2) years of relevant health care experience.[7]

75.     In December 2014, the HSD amended Section 4.4.12.3 of the CC 1.0 Contract to **lower** the minimum qualifications required to work as a care coordinator completing the CNA:

> ….. At a minimum, the care coordinator completing the comprehensive needs assessment shall have a bachelor's degree and/or two (2) years of relevant health care

---

[5]       www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/nm-centennial-care-cms-final-eval-rpt-03232020.pdf (last visited January 18, 2022).
[6] *See e.g.*
[7] *See e.g.*   www.hsd.state.nm.us/wp-content/uploads/Presbyterian-Contract.pdf (containing copy of CC 1.0), p. 46-47, § 4.4.12.3.

experience. A care coordinator's direct supervisor shall have a bachelor's degree and a minimum of two (2) years of relevant health care experience.[8]

76.     Prior to December 2014, an individual met HSD's minimum requirements for the care coordinator position if he or she either (1) had a bachelor's degree in "social work, nursing or other health care profession," or (2) two year's relevant experience.[9]

77.      Prior to December 2014, an individual met the requirements to be a direct supervisor of the care coordinator position under the 1.0 Contract if he or she was a "licensed social worker or registered nurse with a minimum of two (2) years of relevant healthcare experience."[10]

78.     After December 2014, the minimum requirements set by HSD did not require an individual to possess a clinical license to qualify to work in the care coordinator position or direct supervisor to the care coordinator position.

79.     Defendant, directly or through its MCO subsidiary, is currently one of three MCOs contracted with HSD to provide care coordination and other managed care services to individuals enrolled in HSD's Centennial Care 2.0 Medicaid Managed Care Program from January 1, 2019 to December 31, 2023.[11]

80.     Between January 2018 and the present, Defendant caused its MCO subsidiary to enter into the 2.0 Contract, and several amendments to that contract (collectively, "2.0 Contract") which lay out the requirements for the care coordination services provided by Defendants' employees to Medicaid Members during that time period.[12]

---

[8] *See e.g.* bit.ly/11BCBSHSDContract (containing first amendment to HSD MCO Contract 1.0 effective February 2013) ("HSD MCO Contract 1.1") § 4.4.13.2.

[9] *Id.*

[10] *Id.*

[11] /www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/annual-monitoring-reports-jan-dec-2020.pdf (HSD's annual report to CMS).

[12] www.hsd.state.nm.us/lookingforinformation/medical-assistance-division/ (providing contracts for all MCOs that entered into contracts with HSD to provide managed care services during both time periods).

81.     Importantly, the minimum qualifications required by HSD for the care coordinator position have not changed since December 2014 in any version of the 1.0 Contract or the 2.0 Contract.[13]

82.     Since at least December 2014, HSD has only required individuals to have <u>either a</u> bachelor's degree **or** two years of experience to qualify to perform the work required of the care coordinator position in New Mexico's Medicaid Program since December 2014.

83.     Since 2009, HSD has not required individuals to possess clinical licensure—of any kind—to perform the job duties required of the care coordinator position in New Mexico's Centennial Care Medicaid  Managed Program or Centennial Care 2.0 Program.

84.     Since December 2014, HSD has not required individuals to possess clinical licensure of any kind to qualify to perform the work required of the direct supervisor of the care coordinator position in New Mexico's Medicaid Program.

*Defendant's Core Business: Medicaid Managed Care Service Provider*

85.     Defendant administers health plan benefits for approximately 574,000 health plan participants in New Mexico.[14]

86.     Of the nearly 574,000 total health plan participants that Defendant administers health plan benefits for in this state, over half were Medicaid Members enrolled in New Mexico's Centennial Care Medicaid Program.[15]

---

[13] *See e.g.* www.hsd.state.nm.us/wp-content/uploads/BCBS-2.0-Contract-PSC-18-630-8000-0033-A5.pdf (providing latest version of MCO Contract), § 4.4.12.3 ("At a minimum, the care coordinator completing the Comprehensive Needs Assessment shall have a bachelor's degree and/or two (2) years of relevant health care experience. A care coordinator's direct supervisor shall have a bachelor's degree and a minimum of two (2) years of relevant health care experience.").
[14] https://www.hcsc.com/pdf/am-best-ratings-report-2021.pdf (last visited March 24, 2022).
[15]     https://www.hsd.state.nm.us/wp-content/uploads/January-By-Managed-Care-Organization-Fee-for-Service-1.pdf (providing that Defendant was responsible for providing managed care services for 291,619 Medicaid Members in January 2022).

87.     Over 75% of the total health plan participants that Defendant administered health plan benefits for in New Mexico during the year ended December 31, 2021 were health plan participants enrolled in New Mexico's Medicaid Program.[16]

88.     Defendant does not write or sell insurance for Medicaid Members enrolled in New Mexico's Medicaid Program.

89.     Defendant has been required to provide care coordination services to Medicaid Members that complies with 42 C.F.R. 438.208 from at least January 2014 to the present.

90.     As a contractor in New Mexico's Medicaid Program, Defendant has been required and continues to be required to ensure that the care coordination services it provided complied with all versions of the 1.0 Contract and 2.0 Contract in effect from February 1, 2013 to the present.

91.     Defendant has been required and continues to be required to ensure that the care coordination services it provides to Medicaid Members complies with all versions of HSD's Managed Care Policy Manual in effect during the Relevant Time Period.

### *Defendant's NCQA & URAC Accreditations*

92.     Defendant d/b/a Blue Cross and Blue Shield of New Mexico holds an accreditation as a Health Maintenance Organization from the National Committee on Quality Assurance ("NCQA").

93.     In order to maintain its NCQA accreditation, Defendant was required to establish policies and procedures for care coordination and case management that comply with the NCQA accreditation guidelines.

94.     Plaintiff did not create the policies and procedures established for care coordination or case management work required for Defendant to maintain its accreditation with the NCQA.

---

[16] *Id.,* pp. 9, 11.

95.     Care Coordinators did not create the policies and procedures established for case management and care coordination required for Defendant to maintain its accreditation with the NCQA.

96.     Defendant required Plaintiff to follow the policies and procedures Defendant established for case management and care coordination to comply with NCQA's accreditation guidelines.

97.     Defendant required other Care Coordinators to follow the policies and procedures Defendant established for case management and care coordination to comply with NCQA's accreditation guidelines.

### Plaintiff's Employment & Job Duties

98.     During her employment, Plaintiff Aguilar primarily performed Care Coordination Work.

99.     During her employment, Plaintiff Munoz primarily performed Care Coordination Work.

100.    During her employment, Plaintiff Rogers primarily performed Care Coordination Work.

101.    During her employment, Defendant required Plaintiff Aguilar to use a CNA tool, pre-approved by HSD, to produce CNAs for members Defendant assigned to her.

102.    During her employment, Defendant required Plaintiff Munoz to use a CNA tool, pre-approved by HSD, to produce CNAs for members Defendant assigned to her.

103.    During her employment, Defendant required Plaintiff Rogers to use a CNA tool, pre-approved by HSD, to produce CNAs for members Defendant assigned to her.

104.     During her employment, Defendant required Plaintiff Aguilar to produce CNAs for assigned members within the time frame set by the Medicaid Managed Care Services Agreement in effect.

105.     During her employment, Defendant was required to report whether Plaintiff Aguilar produced CNAs for assigned members within the time frames set by the Medicaid Managed Care Services Agreements in Care Coordination Reports that it was required to produce to HSD pursuant to the Medicaid Managed Care Services Agreement in effect.

106.     During her employment, Defendant regularly audited Plaintiff Aguilar—on at least a monthly basis—to ensure that she produced CNAs within or shorter than the time period required under the Medicaid Managed Care Services Agreement in effect.

107.     During her employment, Defendant regularly audited Plaintiff Munoz—on at least a monthly basis—to ensure that she produced CNAs within the time period required under the Medicaid Managed Care Services Agreement in effect.

108.     During her employment, Defendant was required to report whether Plaintiff Munoz produced CNAs for assigned members within the time frames set by the Medicaid Managed Care Services Agreements in Care Coordination Reports that it was required to produce to HSD pursuant to the Medicaid Managed Care Services Agreement in effect.

109.     During her employment, Defendant regularly audited Plaintiff Munoz—on at least a monthly basis—to ensure that she produced CNAs within or shorter than the time period required under the Medicaid Managed Care Services Agreement in effect.

110.     During her employment, Defendant required Plaintiff Rogers to produce CNAs for assigned members within the time frames set by the Medicaid Managed Care Services Agreement in effect.

111.    During her employment, Defendant was required to report whether Plaintiff Rogers produced CNAs for assigned members within the time frames set by the Medicaid Managed Care Services Agreements in Care Coordination Reports that it was required to produce to HSD pursuant to the Medicaid Managed Care Services Agreement in effect.

112.    During her employment, Defendant regularly audited Plaintiff Rogers—on at least a monthly basis—to ensure that she produced CNAs within or shorter than the time period required under the Medicaid Managed Care Services Agreement in effect.

113.    During her employment, Plaintiff Aguilar's job duties included using a CNA tool, pre-approved by HSD, to collect and document Medicaid Members' medical circumstances.

114.    During her employment, Defendant required Member Care Coordinators, assigned to Plaintiff Aguilar's team, to use the same CNA tool—consisting of the same predetermined questions—to collect information from assigned members to produce CNAs.

115.    During her employment, Plaintiff Munoz's job duties included using a CNA tool, pre-approved by HSD, to collect and document Medicaid Members' medical circumstances.

116.    During her employment, Defendant required Member Care Coordinators, assigned to Plaintiff Munoz's team, to use the same CNA tool—consisting of the same predetermined questions—to collect information from assigned members to produce CNAs.

117.    During her employment, Plaintiff Rogers's job duties included using a CNA tool, pre-approved by HSD, to collect and document Medicaid Members' medical circumstances.

118.    During her employment, Defendant required Member Care Coordinators, assigned to Plaintiff Rogers's team, to use the same CNA tool—consisting of the same predetermined questions—to collect information from assigned members to produce CNAs.

119.    During her employment, Plaintiff Aguilar's job duties included producing CNAs to document Medicaid Members' medical circumstances within timeframes set by the MCO Contract.

120.     During her employment, Plaintiff Munoz's job duties included producing CNAs to document Medicaid Members' medical circumstances within timeframes set by the MCO Contract.

121.     During her employment, Plaintiff Munoz's job duties included producing CNAs to document Medicaid Members' medical circumstances within timeframes set by the MCO Contract.

122.     During her employment, Plaintiff Aguilar reported to a direct supervisor who oversaw both Member Care Coordinators and Medical Management Specialists who all worked directly under the same supervisor.

123.     During her employment, Plaintiff Aguilar's job duties involved traveling to member's homes to produce CNAs.

124.     During her employment, Plaintiff Aguilar's job duties involved traveling to member's homes to produce Touchpoints that were required to be in-person under the Medicaid Managed Care Services Agreement in effect.

125.     During her employment, Plaintiff Aguilar's job duties included using CNA results to document the Care Plans of Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

126.     During her employment, Plaintiff Aguilar's job duties included using software, pre-approved for use by HSD, to fill in drop down boxes with results from the CNA to create Care Plans for Members.

127.     During her employment, Defendant reviewed all Care Plans submitted by Plaintiff Aguilar to ensure that the requirements for Care Plans, outlined by the Medicaid Managed Care Services Agreement, were met.

128.     During her employment, Defendant required Plaintiff Aguilar to produce Care Plans for assigned members within the time frames set by the Medicaid Managed Care Services Agreement in effect.

129.    During her employment, Defendant required Plaintiff Aguilar to produce Touchpoints for Members assigned to Care Coordination Level 2 within the timeframes required under the Medicaid Managed Care Services Agreement in effect.

130.    During her employment, Defendant required Plaintiff Aguilar to produce Touchpoints for Members assigned to Care Coordination Level 3 within the timeframes required under the Medicaid Managed Care Services Agreement in effect.

131.    During her employment, Defendant regularly audited Plaintiff Aguilar—on at least a monthly basis—to ensure that she produced Care Plans for Care Coordination Level 2 Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

132.    During her employment, Defendant regularly audited Plaintiff Aguilar—on at least a monthly basis—to ensure that she produced Care Plans for Care Coordination Level 2 Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

133.    During her employment, Defendant was required to report whether Plaintiff Aguilar and other BCBS Care Coordinators met required timeframes for producing Touchpoints in its Care Coordination Reports submitted to HSD pursuant to the Medicaid Managed Care Services Agreement.

134.    During her employment, Defendant was required to report whether Plaintiff Aguilar and other BCBS Care Coordinators met required timeframes for producing Touchpoints in its Care Coordination Reports submitted to HSD pursuant to the Medicaid Managed Care Services Agreement.

135.    During her employment, Plaintiff Aguilar's did not regularly direct the work of two or more full-time employees.

136.    During her employment, Plaintiff Aguilar never hired, fired, or promoted another employee.

137.     During her employment, Plaintiff Aguilar produced the same CNAs, Care Plans and Touchpoints as those produced by Member Care Coordinators employed at the same time as her who were assigned to her team.

138.     During her employment, Plaintiff Aguilar produced CNAs by collecting information from members and then documenting it in Defendant's computer system.

139.     During her employment, Plaintiff Aguilar produced CNAs by using the information gathered during CNAs and using that information to document member's information in Member's Care Plans.

140.     During her employment, Plaintiff Aguilar produced Touchpoints by gathering information from members and documenting that information within the timeframes required under the Agreement.

141.     Under all versions of the Medicaid Managed Care Services Agreement in effect from 2013 to the present, Defendant, either directly or indirectly through the MCO subsidiary, faced monetary penalties if Plaintiff Aguilar or other BCBS Care Coordinators failed to produce CNAs within required timeframes.

142.     Under all versions of the Medicaid Managed Care Services Agreement in effect from 2013 to the present, Defendant, either directly or indirectly through the MCO subsidiary, faced monetary penalties if Plaintiff Aguilar or other BCBS Care Coordinators failed to produce Care Plans within required timeframes.

143.     During her employment with Defendant, Plaintiff Aguilar's job duties did not include directing or overseeing the work of two or more full time employees of Defendant.

144.     During her employment, Plaintiff never hired, fire, promoted or otherwise change the status of another employee.

145.    During her employment with Defendant, Plaintiff Aguilar's job duties did not involve overseeing or directing the work of Defendant's customers.

146.    During her employment, Plaintiff Aguilar's job duties did not include overseeing the work of individuals employed by Defendant's customers.

147.    During her employment, Plaintiff Aguilar's job duties did not include advising HSD regarding how it should operate its Medicaid Managed Care Program.

148.    During her employment, Plaintiff Aguilar's job duties did not include advising the MCO Subsidiary regarding how it should provide care coordination services under the Medicaid Managed Care Services Agreement.

149.    During her employment with Defendant, Plaintiff Aguilar's job duties did not include managing any of Defendant's business departments or any subdivisions of such departments.

150.    During her employment, Plaintiff Aguilar did not direct the work of two or more full-time employees in any week During her employment.

151.    During her employment, Plaintiff Aguilar never hired, fire, promoted or otherwise change the status of another employee.

152.    During her employment, Plaintiff Aguilar did not have the authority to hire, fire, promote or discipline another employee.

153.    During her employment, Plaintiff Aguilar never provided Defendant with a written recommendation to hire, fire, promote or discipline any individual that resulted in that individual actually getting hired, fired, promoted or disciplined by Defendant.

154.    During her employment, Plaintiff Aguilar did not have the authority to formulate, affect, interpret, or implement Defendant's management or operating practices for its business.

155.     During Plaintiff Aguilar's employment, Defendant did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for care coordination under section four of the MCO Contract without prior approval from HSD.

156.     Plaintiff Aguilar did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for the care coordination services he provided with approval from Defendant.

157.      Plaintiff Aguilar did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for the care coordination services he provided without Defendant's approval.

158.     During her employment, Plaintiff Aguilar's job duties did not include providing expert advice to Defendant's management on how they could more efficiently or profitably provide care coordination services.

159.     During her employment, Plaintiff Aguilar's job duties did not include providing expert advice to HSD on how to more efficiently provide care coordination services.

160.     During her employment, Plaintiff Aguilar's job duties did not involve planning the long-term or short-term business objectives of Defendant or Defendant's customers.

161.     During her employment, Plaintiff Aguilar's job duties did not include trouble shooting or problem solving on the behalf of the management of Defendant.

162.     During her employment, Plaintiff Aguilar did not set budgets for Defendant's business or any segment of Defendant's business.

163.     During her employment, Plaintiff Aguilar never created a corporate policy or operating procedure that has been followed by one of Defendant's other employees.

164.     During her employment, Plaintiff Aguilar's job duties did not involve providing traditional nursing care to patients in a clinical setting.

165.    During her employment, Plaintiff Aguilar's job duties did not involve providing traditional nursing care to treat patients in a clinical setting.

166.    During her employment, Defendant did not provide Plaintiff Aguilar with medical malpractice coverage for liability incurred for work performed within the scope of his job duties.

167.    During her employment, Plaintiff Aguilar's job duties did not involve diagnosing members medical conditions.

168.    During her employment, Plaintiff Aguilar's job duties did not involve conducting traditional nursing assessments in which a nurse touches a member and checks their vital signs; Instead, the CNAs conducted by Plaintiff merely involved collecting information using a standardized set of questions and documenting the answers to those questions within required timeframes.

169.    During her employment, Plaintiff Munoz reported to a direct supervisor who oversaw both Member Care Coordinators and Medical Management Specialists who all worked directly under the same supervisor.

170.    During her employment, Plaintiff Munoz's job duties involved traveling to member's homes to produce CNAs.

171.    During her employment, Plaintiff Munoz's job duties involved traveling to member's homes to produce Touchpoints that were required to be in-person under the Medicaid Managed Care Services Agreement in effect.

172.    During her employment, Plaintiff Munoz's job duties included using CNA results to document the Care Plans of Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

173.    During her employment, Plaintiff Munoz's job duties included using software, pre-approved for use by HSD, to fill in drop down boxes with results from the CNA to create Care Plans for Members.

174.    During her employment, Defendant reviewed all Care Plans submitted by Plaintiff Munoz to ensure that the requirements for Care Plans, outlined by the Medicaid Managed Care Services Agreement, were met.

175.    During her employment, Defendant required Plaintiff Munoz to produce Care Plans for assigned members within the time frames set by the Medicaid Managed Care Services Agreement in effect.

176.    During her employment, Defendant required Plaintiff Munoz to produce Touchpoints for Members assigned to Care Coordination Level 2 within the timeframes required under the Medicaid Managed Care Services Agreement in effect.

177.    During her employment, Defendant required Plaintiff Munoz to produce Touchpoints for Members assigned to Care Coordination Level 3 within the timeframes required under the Medicaid Managed Care Services Agreement in effect.

178.    During her employment, Defendant regularly audited Plaintiff Munoz—on at least a monthly basis—to ensure that she produced Care Plans for Care Coordination Level 2 Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

179.    During her employment, Defendant regularly audited Plaintiff Munoz—on at least a monthly basis—to ensure that she produced Care Plans for Care Coordination Level 2 Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

180.    During her employment, Defendant was required to report whether Plaintiff Munoz and other BCBS Care Coordinators met required timeframes for producing Touchpoints in its Care Coordination Reports submitted to HSD pursuant to the Medicaid Managed Care Services Agreement.

181.    During her employment, Defendant was required to report whether Plaintiff Munoz and other BCBS Care Coordinators met required timeframes for producing Touchpoints in its Care

Coordination Reports submitted to HSD pursuant to the Medicaid Managed Care Services Agreement.

182.     During her employment, Plaintiff Munoz's did not regularly direct the work of two or more full-time employees.

183.     During her employment, Plaintiff Munoz never hired, fired, or promoted another employee.

184.     During her employment, Plaintiff Munoz produced the same CNAs, Care Plans and Touchpoints as those produced by Member Care Coordinators employed at the same time as her who were assigned to her team.

185.     During her employment, Plaintiff Munoz produced CNAs by collecting information from members and then documenting it in Defendant's computer system.

186.     During her employment, Plaintiff Munoz produced CNAs by using the information gathered during CNAs and using that information to document member's information in Member's Care Plans.

187.     During her employment, Plaintiff Munoz produced Touchpoints by gathering information from members and documenting that information within the timeframes required under the Agreement.

188.     Under all versions of the Medicaid Managed Care Services Agreement in effect from 2013 to the present, Defendant, either directly or indirectly through the MCO subsidiary, faced monetary penalties if Plaintiff Munoz and other BCBS Care Coordinators failed to produce CNAs within required timeframes.

189.     Under all versions of the Medicaid Managed Care Services Agreement in effect from 2013 to the present, Defendant, either directly or indirectly through the MCO subsidiary, faced

monetary penalties if Plaintiff Munoz or other BCBS Care Coordinators failed to produce Care Plans within required timeframes.

190.     During her employment with Defendant, Plaintiff Munoz's job duties did not include directing or overseeing the work of two or more full time employees of Defendant.

191.     During her employment, Plaintiff never hired, fire, promoted or otherwise change the status of another employee.

192.     During her employment with Defendant, Plaintiff Munoz's job duties did not involve overseeing or directing the work of Defendant's customers.

193.     During her employment, Plaintiff Munoz's job duties did not include overseeing the work of individuals employed by Defendant's customers.

194.     During her employment, Plaintiff Munoz's job duties did not include advising HSD regarding how it should operate its Medicaid Managed Care Program.

195.     During her employment, Plaintiff Munoz's job duties did not include advising the MCO Subsidiary regarding how it should provide care coordination services under the Medicaid Managed Care Services Agreement.

196.     During her employment with Defendant, Plaintiff Munoz's job duties did not include managing any of Defendant's business departments or any subdivisions of such departments.

197.     During her employment, Plaintiff Munoz did not direct the work of two or more full-time employees in any week During her employment.

198.     During her employment, Plaintiff Munoz never hired, fire, promoted or otherwise change the status of another employee.

199.     During her employment, Plaintiff Munoz did not have the authority to hire, fire, promote or discipline another employee.

200.     During her employment, Plaintiff Munoz never provided Defendant with a written recommendation to hire, fire, promote or discipline any individual that resulted in that individual actually getting hired, fired, promoted or disciplined by Defendant.

201.     During her employment, Plaintiff Munoz did not have the authority to formulate, affect, interpret, or implement Defendant's management or operating practices for its business.

202.     During Plaintiff Munoz's employment, Defendant did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for care coordination under section four of the MCO Contract without prior approval from HSD.

203.     Plaintiff Munoz did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for the care coordination services he provided with approval from Defendant.

204.      Plaintiff Munoz did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for the care coordination services he provided without Defendant's approval.

205.     During her employment, Plaintiff Munoz's job duties did not include providing expert advice to Defendant's management on how they could more efficiently or profitably provide care coordination services.

206.     During her employment, Plaintiff Munoz's job duties did not include providing expert advice to HSD on how to more efficiently provide care coordination services.

207.     During her employment, Plaintiff Munoz's job duties did not involve planning the long-term or short-term business objectives of Defendant or Defendant's customers.

208.     During her employment, Plaintiff Munoz's job duties did not include trouble shooting or problem solving on the behalf of the management of Defendant.

209.    During her employment, Plaintiff Munoz did not set budgets for Defendant's business or any segment of Defendant's business.

210.    During her employment, Plaintiff Munoz never created a corporate policy or operating procedure that has been followed by one of Defendant's other employees.

211.    During her employment, Plaintiff Munoz's job duties did not involve providing traditional nursing care to patients in a clinical setting.

212.    During her employment, Plaintiff Munoz's job duties did not involve providing traditional nursing care to treat patients in a clinical setting.

213.    During her employment, Defendant did not provide Plaintiff Munoz with medical malpractice coverage for liability incurred for work performed within the scope of his job duties.

214.    During her employment, Plaintiff Munoz's job duties did not involve diagnosing members medical conditions.

215.    During her employment, Plaintiff Munoz's job duties did not involve conducting traditional nursing assessments in which a nurse touches a member and checks their vital signs; Instead, the CNAs conducted by Plaintiff merely involved collecting information using a standardized set of questions and documenting the answers to those questions within required timeframes.

216.    During her employment, Plaintiff Rogers reported to a direct supervisor who oversaw both Member Care Coordinators and Medical Management Specialists who all worked directly under the same supervisor.

217.    During her employment, Plaintiff Rogers' job duties involved traveling to member's homes to produce CNAs.

218.    During her employment, Plaintiff Rogers' job duties involved traveling to member's homes to produce Touchpoints that were required to be in-person under the Medicaid Managed Care Services Agreement in effect.

30

219.    During her employment, Plaintiff Rogers' job duties included using CNA results to document the Care Plans of Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

220.    During her employment, Plaintiff Rogers' job duties included using software, pre-approved for use by HSD, to fill in drop down boxes with results from the CNA to create Care Plans for Members.

221.    During her employment, Defendant reviewed all Care Plans submitted by Plaintiff Rogers to ensure that the requirements for Care Plans, outlined by the Medicaid Managed Care Services Agreement, were met.

222.    During her employment, Defendant required Plaintiff Rogers to produce Care Plans for assigned members within the time frames set by the Medicaid Managed Care Services Agreement in effect.

223.    During her employment, Defendant required Plaintiff Rogers to produce Touchpoints for Members assigned to Care Coordination Level 2 within the timeframes required under the Medicaid Managed Care Services Agreement in effect.

224.    During her employment, Defendant required Plaintiff Rogers to produce Touchpoints for Members assigned to Care Coordination Level 3 within the timeframes required under the Medicaid Managed Care Services Agreement in effect.

225.    During her employment, Defendant regularly audited Plaintiff Rogers—on at least a monthly basis—to ensure that she produced Care Plans for Care Coordination Level 2 Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

226.    During her employment, Defendant regularly audited Plaintiff Rogers—on at least a monthly basis—to ensure that she produced Care Plans for Care Coordination Level 2 Members within the timeframes set by the Medicaid Managed Care Services Agreement in effect.

227. During her employment, Defendant was required to report whether Plaintiff Rogers and other BCBS Care Coordinators met required timeframes for producing Touchpoints in its Care Coordination Reports submitted to HSD pursuant to the Medicaid Managed Care Services Agreement.

228. During her employment, Defendant was required to report whether Plaintiff Rogers and other BCBS Care Coordinators met required timeframes for producing Touchpoints in its Care Coordination Reports submitted to HSD pursuant to the Medicaid Managed Care Services Agreement.

229. During her employment, Plaintiff Rogers did not regularly direct the work of two or more full-time employees.

230. During her employment, Plaintiff Rogers never hired, fired, or promoted another employee.

231. During her employment, Plaintiff Rogers produced the same CNAs, Care Plans and Touchpoints as those produced by Member Care Coordinators employed at the same time as her who were assigned to her team.

232. During her employment, Plaintiff Rogers produced CNAs by collecting information from members and then documenting it in Defendant's computer system.

233. During her employment, Plaintiff Rogers produced CNAs by using the information gathered during CNAs and using that information to document member's information in Member's Care Plans.

234. During her employment, Plaintiff Rogers produced Touchpoints by gathering information from members and documenting that information within the timeframes required under the Agreement.

235.     Under all versions of the Medicaid Managed Care Services Agreement in effect from 2013 to the present, Defendant, either directly or indirectly through the MCO subsidiary, faced monetary penalties if Plaintiff Rogers or other BCBS Care Coordinators failed to produce CNAs within required timeframes.

236.     Under all versions of the Medicaid Managed Care Services Agreement in effect from 2013 to the present, Defendant, either directly or indirectly through the MCO subsidiary, faced monetary penalties if Plaintiff Rogers or other BCBS Care Coordinators failed to produce Care Plans within required timeframes.

237.     During her employment with Defendant, Plaintiff Rogers' job duties did not include directing or overseeing the work of two or more full time employees of Defendant.

238.     During her employment, Plaintiff never hired, fire, promoted or otherwise change the status of another employee.

239.     During her employment with Defendant, Plaintiff Rogers' job duties did not involve overseeing or directing the work of Defendant's customers.

240.     During her employment, Plaintiff Rogers' job duties did not include overseeing the work of individuals employed by Defendant's customers.

241.     During her employment, Plaintiff Rogers' job duties did not include advising HSD regarding how it should operate its Medicaid Managed Care Program.

242.     During her employment, Plaintiff Rogers' job duties did not include advising the MCO Subsidiary regarding how it should provide care coordination services under the Medicaid Managed Care Services Agreement.

243.     During her employment with Defendant, Plaintiff Rogers' job duties did not include managing any of Defendant's business departments or any subdivisions of such departments.

244.     During her employment, Plaintiff Rogers did not direct the work of two or more full-time employees in any week During her employment.

245.     During her employment, Plaintiff Rogers never hired, fire, promoted or otherwise change the status of another employee.

246.     During her employment, Plaintiff Rogers did not have the authority to hire, fire, promote or discipline another employee.

247.     During her employment, Plaintiff Rogers never provided Defendant with a written recommendation to hire, fire, promote or discipline any individual that resulted in that individual actually getting hired, fired, promoted or disciplined by Defendant.

248.     During her employment, Plaintiff Rogers did not have the authority to formulate, affect, interpret, or implement Defendant's management or operating practices for its business.

249.     During Plaintiff Rogers' employment, Defendant did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for care coordination under section four of the MCO Contract without prior approval from HSD.

250.     Plaintiff Rogers did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for the care coordination services he provided with approval from Defendant.

251.      Plaintiff Rogers did not have the authority to deviate from the procedures and timeframes set by the MCO Contract for the care coordination services he provided without Defendant's approval.

252.     During her employment, Plaintiff Rogers' job duties did not include providing expert advice to Defendant's management on how they could more efficiently or profitably provide care coordination services.

253.     During her employment, Plaintiff Rogers' job duties did not include providing expert advice to HSD on how to more efficiently provide care coordination services.

254.     During her employment, Plaintiff Rogers' job duties did not involve planning the long-term or short-term business objectives of Defendant or Defendant's customers.

255.     During her employment, Plaintiff Rogers' job duties did not include trouble shooting or problem solving on the behalf of the management of Defendant.

256.     During her employment, Plaintiff Rogers did not set budgets for Defendant's business or any segment of Defendant's business.

257.     During her employment, Plaintiff Rogers never created a corporate policy or operating procedure that has been followed by one of Defendant's other employees.

258.     During her employment, Plaintiff Rogers' job duties did not involve providing traditional nursing care to patients in a clinical setting.

259.     During her employment, Plaintiff Rogers' job duties did not involve providing traditional nursing care to treat patients in a clinical setting.

260.     During her employment, Defendant did not provide Plaintiff Rogers with medical malpractice coverage for liability incurred for work performed within the scope of his job duties.

261.     During her employment, Plaintiff Rogers' job duties did not involve diagnosing members medical conditions.

262.     During her employment, Plaintiff Rogers' job duties did not involve conducting traditional nursing assessments in which a nurse touches a member and checks their vital signs; Instead, the CNAs conducted by Plaintiff merely involved collecting information using a standardized set of questions and documenting the answers to those questions within required timeframes.

263.     Defendant has never required individuals to possess a clinical license, of any kind, to produce CNAs as a BCBS Care Coordinator.

264.    Defendant has never required individuals to possess a clinical license, of any kind, to produce CNAs as a Member Care Coordinator.

265.    Defendant has never required individuals to possess a clinical license, of any kind, to produce Care Plans as a BCBS Care Coordinator.

266.    Defendant has never required individuals to possess a clinical license, of any kind, to produce Care Plans as a Member Care Coordinator.

267.    Defendant has never required individuals to possess a clinical license, of any kind, to produce Touchpoints for assigned members as a BCBS Care Coordinator.

268.    Defendant has never required individuals to possess a clinical license, of any kind, to produce Touchpoints for assigned members.

269.    Defendant has always required individuals to possess a driver's license in order to qualify to produce CNAs under the Agreement as a BCBS Care Coordinator.

270.    Defendant has never required individuals to possess a clinical license to produce CNAs, Care Plans or Touchpoints for Members because no such licensure is required by any of the Medicaid Managed Care Service Agreements in effect from 2013 to the present.

271.    Defendant required Plaintiff Aguilar to work over 40 hours in one or more individual workweeks in the last three (3) years.

272.    During his employment with Defendant, Plaintiff Aguilar worked over 40 hours in one or more individual workweeks in the last three (3) years.

273.    Defendant classified Plaintiff Aguilar as exempt from the overtime provisions of the FLSA and NMMWA.

274.    Because Plaintiff Aguilar primary job duty involved gathering and documenting information (for CNAs, Care Plans, and Touchpoints), she primarily performed non-exempt work.

275.    Because Plaintiff Aguilar primarily performed non-exempt work, Defendant should have classified her as non-exempt.

276.    Defendant paid Plaintiff Aguilar a salary.

277.    When Plaintiff Aguilar worked over 40 hours in individual workweeks, Defendant did not pay her overtime at one-and-one-half times her regular rate of pay for hours worked over 40.

278.    Defendant required Plaintiff Munoz to work over 40 hours in one or more individual workweeks in the last three (3) years.

279.    During his employment with Defendant, Plaintiff Munoz worked over 40 hours in one or more individual workweeks in the last three (3) years.

280.    Defendant classified Plaintiff Munoz as exempt from the overtime provisions of the FLSA and NMMWA.

281.    Because Plaintiff Munoz primary job duty involved gathering and documenting information (for CNAs, Care Plans, and Touchpoints), she primarily performed non-exempt work.

282.    Because Plaintiff Munoz primarily performed non-exempt work, Defendant should have classified her as non-exempt.

283.    Defendant paid Plaintiff Munoz a salary.

284.    When Plaintiff Munoz worked over 40 hours in individual workweeks, Defendant did not pay her overtime at one-and-one-half times her regular rate of pay for hours worked over 40.

285.    Defendant required Plaintiff Rogers to work over 40 hours in one or more individual workweeks in the last three (3) years.

286.    During his employment with Defendant, Plaintiff Rogers worked over 40 hours in one or more individual workweeks in the last three (3) years.

287.    Defendant classified Plaintiff Rogers as exempt from the overtime provisions of the FLSA and NMMWA.

288.    Because Plaintiff Rogers primary job duty involved gathering and documenting information (for CNAs, Care Plans, and Touchpoints), she primarily performed non-exempt work.

289.    Because Plaintiff Rogers primarily performed non-exempt work, Defendant should have classified her as non-exempt.

290.    Defendant paid Plaintiff Rogers a salary.

291.    When Plaintiff Rogers worked over 40 hours in individual workweeks, Defendant did not pay her overtime at one-and-one-half times her regular rate of pay for hours worked over 40.

292.    The Care Coordination Work performed by Plaintiff and other Care Coordinators was provided to Members under the "Blue Cross and Blue Shield of New Mexico" trade name.

293.    Defendant maintained control, oversight and direction over its operations and employment practices pertaining to Plaintiffs.

294.    Defendant maintained control, oversight and direction over its operations and employment practices pertaining to Care Coordinators other than Plaintiffs.

295.    Defendant maintained control, oversight and direction over Plaintiffs, including over timekeeping, payroll and other employment practices that applied to them.

296.    Defendant maintained control, oversight and direction over Care Coordinators other than Plaintiffs, including over timekeeping, payroll and other employment practices that applied to them.

297.    Defendant employed Plaintiffs to produce Care Coordination Work for HSD consistent with the requirements and mandatory timeframes set forth by the Medicaid Managed Care Services Agreement in effect from 2013 to the present.

298.    Defendant employed BCBS Care Coordinators to produce Care Coordination Work for HSD consistent with the requirements and mandatory timeframes set forth by the Medicaid Managed Care Services Agreement in effect from 2013 to the present.

38

299.     Defendant employed Member Care Coordinators to produce Care Coordination Work for HSD consistent with the requirements and mandatory timeframes set forth by the Medicaid Managed Care Services Agreement in effect from 2013 to the present.

300.     Defendant employed Medical Management Specialists to produce Care Coordination Work for HSD consistent with the requirements and mandatory timeframes set forth by the Medicaid Managed Care Services Agreement in effect from 2013 to the present.

301.     During her employment, Aguilar was an "employee" of Defendant as defined by the FLSA in 29 U.S.C. § 203(e).

302.     During her employment, Aguilar was an "employee" of Defendant as defined by the NMMWA in N.M. Stat. Ann. § 50-4-21(c).

303.     During her employment, Defendant was Plaintiff Aguilar's "employer" as defined by the FLSA in 29 U.S.C. § 203(d).

304.     During her employment, Defendant was Plaintiff Aguilar's "employer" as defined by the NMMWA in N.M. Stat. Ann. § 50-4-21(b).

305.     During her employment, Munoz was an "employee" of Defendant as defined by the FLSA in 29 U.S.C. § 203(e).

306.     During her employment, Munoz was an "employee" of Defendant as defined by the NMMWA in N.M. Stat. Ann. § 50-4-21(c).

307.     During her employment, Defendant was Plaintiff Munoz's "employer" as defined by the FLSA in 29 U.S.C. § 203(d).

308.     During her employment, Defendant was Plaintiff Munoz's "employer" as defined by the NMMWA in N.M. Stat. Ann. § 50-4-21(b).

309.     During her employment, Rogers was an "employee" of Defendant as defined by the FLSA in 29 U.S.C. § 203(e).

310.    During her employment, Rogers was an "employee" of Defendant as defined by the NMMWA in N.M. Stat. Ann. § 50-4-21(c).

311.    During her employment, Defendant was Plaintiff Rogers' "employer" as defined by the FLSA in 29 U.S.C. § 203(d).

312.    During her employment, Defendant was Plaintiff Rogers' "employer" as defined by the NMMWA in N.M. Stat. Ann. § 50-4-21(b).

313.    Defendant is an "enterprise" as defined by the FLSA in 29 U.S.C. § 203(r)(1).

314.    Defendant is an enterprise engaged in commerce or in the production of goods for commerce as defined by the FLSA in 29 U.S.C. § 203(s)(1)(A).

315.    Defendant has had more than $500,000 in sales made or business done in each of the last three calendar years.

### Continuing Course of Conduct Allegations

316.     In 2009, the New Mexico 49th Legislature unanimously passed—and the governor signed—House Bill 489.  House Bill 489 became effective June 19, 2009. With House Bill 489's passage, the statute of limitations for wage claims, including unpaid overtime claims, under the NM Wage Act was extended from one year to three years. NMSA 1978 § 37-1-5. Also, effective June 19, 2009, the statute of limitations under the NM Wage Act is tolled when the violation is part of a "continuing course of conduct."  NMSA 1978 § 50-4-32.

317.    Defendant has administered health plan for customers since acquiring the assets of Blue Cross and Blue Shield of New Mexico in 2001.

318.    Defendant has contracted with HSD to provide care coordination services since at least February 2013.

319.    Defendant have employed one or more Care Coordinators that they paid on a salary basis and classified as exempt since at least January 1, 2014.

320.    Defendant have employed one or more Care Coordinators in New Mexico that it paid on a salary basis since at least June 19, 2009.

321.    In one or more work weeks prior to July 11, 2016, Defendant employed Care Coordinators in New Mexico who were classified as exempt and paid on a salary basis.

**Collective Action Allegations**

322.    Plaintiffs bring their FLSA claims as a collective action.

323.    Plaintiffs' consent forms to participate in this collective action areattached to this Complaint as Exhibit A.

324.    The collective action is defined as follows:

All individuals employed by Defendant as Medical Management Specialists in New Mexico in the last three years who were paid a salary and were classified as exempt from overtime under the FLSA ("Collective Action Members"). This definition specifically excludes the portion of the claims released by any Medical Management Specialists who participated in the settlement reached by the Plaintiffs in *Candelaria v. Healthcare Service Corporation*, No. 2:17-cv-404, ECF 84 (D.N.M. Nov. 4, 2020) (approving class and collective action settlement).

325.    Plaintiffs are similarly situated to potential Collective Action Members because they were paid the same way and performed the same primary job duties as Collective Action Members.

326.    In the last three years, Defendant employed individuals who performed the same primary job duties as the Plaintiffs.

327.    Of Defendant's employees who performed the same primary job duties the Plaintiffs over the last three years, Defendant classified some or all as exempt from the overtime provisions of the FLSA and paid them a salary.

328.    Of employees Defendant classified as exempt and who performed the same primary job duties as the Plaintiffs in the last three years, some or all worked over 40 hours in individual workweeks.

329.   Defendant maintained one or more common job descriptions for BCBS Care Coordinators.

330.   Defendant maintained one or more common job descriptions for Member Care Coordinators.

331.   Defendant maintained one or more common job descriptions for Medical Management Specialists.

332.   Defendant, either directly or through its MCO Subsidiary, was required to provide HSD with one or more versions of a "Care Coordination Staffing Plan" pursuant to the MCO Contract, which at a minimum required the following:

> (i) the number of care coordinators, care coordination supervisors, other care coordination team members the CONTRACTOR plans to employ; (ii) the ratio of care coordinators to Members; (iii) the CONTRACTOR's plans to maintain ratios in accordance with the maximum ratios in Section [4.4.12.5] of this Agreement;  (iv) an explanation of the methodology  for determining such ratios; (vi) how the CONTRACTOR will ensure that such ratios are sufficient to fulfill the requirements specified in this Agreement; (v)  the  roles  and responsibilities for each member of the care coordination team; and (vi) how the CONTRACTOR will use care coordinators to meet the needs of New Mexico's unique population.

333.   Defendant, either directly or through its MCO subsidiary, is required to have specific policies and procedures that specify the specific qualifications, experience and training provided to BCBS Care Coordinators, including Member Care Coordinators and Medical Management Specialists.

334.   Defendant provided standardized initial training to newly hired BCBS Care Coordinators and ongoing training at least annually to all BCBS Care Coordinators.

335.   Defendant have the names and addresses for potential Collective Action Members in their payroll or personnel records.

336.   Defendant have email addresses for potential Collective Action Members in their payroll or personnel records.

337.    Defendant have phone numbers for potential Collective Action Members in their payroll or personnel records.

338.    Defendant are aware or should have been aware that the FLSA required them to pay potential Collective Action Members overtime because they primarily performed non-exempt work.

**Class Action Allegations**

339.    Plaintiffs bring their NMMWA claims as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

340.    Plaintiffs seek class certification under Fed. R. 23 of the following state law class:

All individuals employed by Defendant as Medical Management Specialists in New Mexico from February 1, 2013 to the present who were paid on a salary basis and classified as exempt from overtime (the "Class").

341.    The Class has over 100 members.

342.    As a result, the Class is so numerous that joinder of all members is not practical.

343.    There are questions of law or fact common to the Class, including: (1) whether members of the Class primarily performed non-exempt work; (2) whether Defendant violated the NMMWA by refusing to pay members of the Class overtime pay; (3) the proper measure of damages if Defendant misclassified members of the Class as exempt from the overtime provisions of the NMMWA; (4) whether Defendant violated the NMMWA as part of a continuing course of conduct under NMSA 1978 § 50-4-32.

344.    Plaintiff Aguilar's overtime claims are typical of those of the Class because they arise out of Defendant's uniform compensation practices.

345.     Defendant's defenses to Plaintiff Aguilar's claims are typical of its defenses to those of the Class because they are grounded in the same compensation practices.

346.    Plaintiff Aguilar can fairly and adequately protect the interests of the Class because they are asserting the same claims as the Class.

347.    Plaintiff Aguilar can fairly and adequately protect the interests of the Class because she has no interests adverse to the Class.

348.    Plaintiff Munoz's overtime claims are typical of those of the Class because they arise out of Defendant's uniform compensation practices.

349.    Defendant's defenses to Plaintiff Munoz's claims are typical of its defenses to those of the Class because they are grounded in the same compensation practices.

350.    Plaintiff Munoz can fairly and adequately protect the interests of the Class because they are asserting the same claims as the Class.

351.    Plaintiff Munoz can fairly and adequately protect the interests of the Class because she has no interests adverse to the Class.

352.    Plaintiff Rogers' overtime claims are typical of those of the Class because they arise out of Defendant's uniform compensation practices.

353.    Defendant's defenses to Plaintiff Rogers' claims are typical of its defenses to those of the Class because they are grounded in the same compensation practices.

354.    Plaintiff Rogers can fairly and adequately protect the interests of the Class because they are asserting the same claims as the Class.

355.    Plaintiff Rogers can fairly and adequately protect the interests of the Class because she has no interests adverse to the Class.

356.    The Plaintiffs can fairly and adequately protect the interests of the Class because they have retained counsel experienced in class action employment litigation, including against this Defendant and other MCOs contracted with HSD that have classified care coordination workers as exempt from overtime.

357.    The common questions of law and fact in this lawsuit predominate over the variations which may exist between members of the Class, if any.

358.    Common proof will drive the resolution of the predominating questions in this case.

359.    For example, the Medicaid Managed Care Services Agreement and study referenced in ¶ 60, supra, establish that no education or clinical licensure is a standard prerequisite to perform the Care Coordination Work primarily performed by the Class.

360.    Moreover, the Medicaid Managed Care Services Agreement, HSD's Managed Care Policy Manual, NMAC 8.308.10, NCQA accreditation guidelines, 42 C.F.R. § 438.208, and Defendant's policies intended to enforce those other requirements, all define and control the job duties performed by Medical Management Specialists, including how they were performed, the tools they were required to use in performing those job duties, and the timeframes they had to meet in performing them.

361.    Finally, Defendant's Care Coordination Reports and Care Coordination Staffing Plan should establish whether Defendant in fact staffed all BCBS Care Coordinators, including Member Care Coordinators and Medical Management Specialists, to perform the same standardized Care Coordination Work under the Medicaid Managed Care Services Agreement.

362.    The Plaintiffs and the members of the Class on the one hand, and Defendant on the other, have a commonality of interest in the subject matter of this lawsuit and remedy sought, namely back wages, interest, penalties, attorneys' fees, and costs.

363.    If individual actions were required to be brought by each member of the Class injured or affected, it would necessarily result in a multiplicity of lawsuits, creating a hardship to the individuals and to the Court, as well as to Defendant.

364.    Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the Class is entitled.

365.    The books and records of Defendant are material to the claims of the Class because they disclose the hours worked by each member of the Class and the rate of pay for that work.

## COUNT I
### Violation of the Fair Labor Standards Act
### (Collective Action)

366.    Plaintiffs incorporate here the previous allegations of this Complaint.

367.    This count arises from Defendant's violation of the FLSA by failing to pay overtime wages to Plaintiffs and Collective Action Members when they worked over 40 hours in individual workweeks.

368.    Plaintiffs were not exempt from the overtime provisions of the FLSA.

369.    The Collective Action Members were not exempt from the overtime provisions of the FLSA.

370.    Plaintiffs were directed by Defendant to work, and did work, over 40 hours in one or more individual workweeks during the prior three years.

371.    Other Collective Action Members were directed by Defendant to work, and did work, over 40 hours in one or more individual workweeks during the prior three years.

372.    Defendant paid Plaintiffs a salary.

373.    Defendant paid other Collective Action Members a salary.

374.    Defendant violated the FLSA by failing to pay overtime to Plaintiffs at one-and-one-half times her regular rate of pay when she worked over 40 hours in one or more individual workweeks.

375.    Defendant violated the FLSA by failing to pay overtime to other Collective Action Members at one-and-one-half times their regular rates of pay when they worked over 40 hours in one or more individual workweeks.

376.    Defendant's violations of the FLSA were willful because they received complaints from Care Coordinators that alerted Defendant that they were paying one or more of those employees incorrectly, including a lawsuit filed in the District of New Mexico by a group of employees on April 3, 2017.

377.     Alternatively, Defendant's violations were willful because they classified other employees who performed many of the same primary job duties as Medical Management Specialists as non-exempt from the FLSA's overtime requirements, including Member Care Coordinators it reclassified as non-exempt over the past three years.

WHEREFORE, Plaintiffs, on behalf of themselves and the Collective Action Members, seek a judgment against Defendant, jointly and severally, as follows:

A.     All unpaid overtime wages due to Plaintiffs and the Collective Action Members;

B.     Liquidated damages equal to the unpaid overtime compensation due;

C.     Reasonable attorneys' fees and costs incurred in filing and prosecuting this lawsuit; and

D.     Such other relief as this Court deems appropriate.

### COUNT II
### Violation of the New Mexico Minimum Wage Act
### Class Action
### (Class Action)

378.     Plaintiffs incorporate here the previous allegations of this Complaint.

379.     This count arises from Defendant's violation of the NMMWA for its failure to pay Plaintiffs and the Class overtime pay when they worked over 40 hours in individual workweeks.

380.     Defendant classified Plaintiffs as exempt from the overtime provisions of the NMMWA.

381.     Defendant classified members of the Class as exempt from the overtime provisions of the NMMWA.

382.     Plaintiffs were not exempt from the overtime provisions of the NMMWA.

383.     Members of the Class were not exempt from the overtime provisions of the NMMWA.

384.    Plaintiffs were regularly directed to work by Defendant, and did work, over 40 hours in individual workweeks.

385.    Members of the Class were regularly directed to work by Defendant, and did work, over 40 hours in individual workweeks.

386.    Defendant violated the NMMWA by failing to pay Plaintiffs and members of the Class overtime at one and one-half times their regular rates of pay when they worked over 40 hours in individual workweeks.

387.    Defendant's violations of the NMMWA with respect to the Class occurred as part of a continuing course of conduct under N.M. Stat. Ann. in § 50-4-32.

388.    Because Defendant's violations of the NMMWA with respect to the Class occurred as part of a continuing course of conduct, Plaintiffs and members of the Class are entitled to recover for all such violations regardless of the date on which they occurred.

WHEREFORE, Plaintiffs, on behalf of himself and the Class, seeks a judgment against Defendant, as follows:

A.    All unpaid overtime wages due to Plaintiffs and the Class;

B.    Treble damages equal to double the unpaid overtime compensation due;

C.    Reasonable attorneys' fees and costs incurred in filing and prosecuting this action; and

D.    Such other relief as this Court deems appropriate.

**Jury Demand**

Plaintiffs demand a trial by jury.

Respectfully submitted,

s/Jack Siegel
JACK SIEGEL
Jack@siegellawgroup.biz
Texas Bar No. 24070621
Siegel Law Group PLLC

48

5706 E. Mockingbird Lane | Suite 115
Dallas, Texas 75206
P: (214) 790-4454
www.4overtimelawyer.com

TRAVIS M. HEDGPETH
Texas Bar No. 24074386
THE HEDGPETH LAW FIRM, PC
3050 Post Oak Blvd., Suite 510
Houston, Texas 77056
P: (281) 572-0727
travis@hedgpethlaw.com

**Attorneys for Plaintiff and others similarly situated**

## CERTIFICATE OF SERVICE

Service of this Complaint will be made on Defendant along with a copy of the summons to be issued by the clerk according to the federal rules of civil procedure.

_/s/   Jack Siegel_
Jack Siegel